## Case No. 3,565.

### The DANIEL DREW.

[13 Blatchf. 523.] [1]

Circuit Court, E. D. New York. Sept. Term, 1876.

SHIPPING — NAVIGATION OF HUDSON RIVER — STEAMER PASSING TUG WITH TOWS—SWELLS.

1. The Hudson river is a national highway, upon which steamtugs with their tows, and steam passenger boats, are equally at liberty to travel. Each class of boats may occupy the river with their boats of such size and construction as they may choose, and at the speed they may think fit, subject to the qualification, that the rights and interests of others are not unreasonably impaired.

[Cited in The Rhode Island, 24 Fed. 295; The New York, 34 Fed. 758.]

--------

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

2. There is no absolute rule of law which limits the space a boat or its accompaniments may occupy upon a public river, or which prescribes the speed it may use, or the swell it may make, or how near it may come to another boat. It depends upon the reasonableness of the thing done, under all the circumstances of each particular case. It is not the rule, that, in the event of an injury from a swell, the boat causing the swell is at all events responsible.

3. The steamtug Ohio, with one boat at her side, and a tow of twenty boats, in five tiers, at her stern, was passed by the steam passenger boat Daniel Drew, in deep water and with a light wind, and, by the swell and motion caused by the Drew, and by the slacking of the tug's hawser, the boats in the tow were thrown against each other, and the libellant's boat was injured. It appeared that the speed was that usually kept up in passing a tow in deep water, that the swell made was not unusual, that neither those on the Ohio nor those on the Drew apprehended danger at the time from passing at the speed kept up, that the boats in the tow were not well arranged, and that the Drew exercised reasonable care and diligence: *Held*, that the Drew was not liable for an injury to one of the boats in the tow, from the collision mentioned.

[Cited in The Morrisania, Case No. 9,838; The Drew, 22 Fed. 853.]

4. The accident was in part, at least, attributable to the fact that the tiers of boats were towed by lines only six or eight feet in length, with nothing to prevent their coming together when operated upon by a force in the rear, and with a slackened hawser from the tug.

5. The English cases on the subject examined.

[Appeal from the district court of the United States for the eastern district of New York.]

Beebe, Wilcox & Hobbs, for libellant.
Cornelius Van Santvoord, for claimants.

HUNT, Circuit Justice. On the 2d of June, 1873, the tug-boat Ohio left Albany on her voyage down the Hudson river to New York. She had lashed to her port side the canalboat Billy Lape, and had, in addition, a tow of twenty canal-boats. These boats were in five tiers, of four boats in each tier. The port boat of the first tier was the George H. Price; the port boat of the second tier was the Marion; the port boat of the third tier was the Shoo Fly. The boat in the first tier next to the George H. Price was the Chick Henly; the boat in the second tier next to the Marion was the H. A. Peck. All of the boats were loaded. At about 11 o'clock of the next day this tow had reached a point known as Camp Crossover, six miles below Catskill, and ten miles below the city of Hudson. At this point there was a shallow in the river, on each side of which was a channel of nearly a thousand feet in width. It is unusual for passenger boats to take the west channel. The eastern is the main channel, and is usually taken by the boats going down the river. The Ohio had taken this eastern channel with her tow, and was about in the middle of the channel, heading a little to the southwest, and was making about three miles an hour. As the Ohio was near the lower end of the shallow or middle ground, the

steamboat Daniel Drew, also going down the river, entered the eastern channel. The Drew was a daily passenger boat between Albany and New York, and had left Albany at 8.30 a. m. of the same morning, in the performance of one of her regular trips. She passed the Ohio and her tow in this passage, and, by the swell and suction caused by her, the libellant's boat, the Marion, was brought into collision with the boat George H. Price, which was in front of it, and the boat Shoo Fly, which was in the rear of it, and received damage. The usual speed of the Drew was seventeen miles to eighteen miles per hour, and she kept up that speed while passing the tow on this occasion. The Drew passed within one hundred feet of the tow, to the east of it, and within one hundred feet of the easterly shore of the channel, and as near to the east shore as was safe. No signal to slacken speed in passing was given to the Drew by the Ohio or any of its tow. The passage to the east of the Ohio was safer than a passage to the west of her in the same channel. It is not the custom of boats navigating the river to slacken their speed while passing a tow in this part of the river, nor at any point south of or below the city of Hudson. There were two hawsers from the Ohio, reaching to the outer boats of the first tier, one attached to the George H. Price, and the other to the canal-boat on the starboard side of the first tier. These hawsers were from 450 to 480 feet in length. The middle boats were fastened to the outer ones by breast lines and spring lines, and the tiers following to the tiers in front by spring lines. The length of lines between the different tiers was six to eight feet. As the Drew passed the Ohio, the lines by which the boat Billy Lape was fastened to the Ohio broke. The lines of some of the boats in the tow at the rear were also broken. Before this breaking of the lines, the Ohio had slowed for the purpose of easing her hawsers. The Drew was proceeding at her customary speed, which was not unusual for passenger boats, and not unreasonable, and made no unusual swell. She had no reason to apprehend danger to the Ohio or her tow in passing her, and received no intimations from the Ohio that danger would be incurred if she passed her on her appointed course, and at the speed she was using. The Ohio apprehended no danger, from the Drew's passing as she did. The water was deep at the point in question. The injury to the libellant's boat was caused by the coming together of the sterns and stems of the boats in line with each other, caused by the swell of the water and the suction made by the Drew, and the nearness to each other of the several tiers of boats. The forward swell of the Drew threw the Shoo Fly into the stern of the Marion, and the stem of the Marion into the stern of the Price, by which collisions the damage complained of was occasioned. The breaking of the lines of the Billy Lape, and her parting

from the Ohio, had no material effect upon the collision of the boats in the hawser tiers. The tiers of boats were lashed too close together for safe navigation.

The district judge held that the Drew was in fault, and gave judgment against her for the damage sustained by the libellant.

These several steamboats were engaged in a lawful occupation, upon a great public highway, and by the use of lawful means. The Hudson river is a national water-course, open to all who choose to use it. The owners of the Ohio had the right to navigate it with their steamboats and tows. The owners of the canal-boats had the right to be towed thereon by the steamboat. The Daniel Drew was engaged in an occupation equally legitimate. Her owners had the same right to the use of the river for the purpose of carrying passengers upon their vessels, that the Ohio and her tow had for their purposes. All had the right to its use, in the manner necessary for their lawful pursuits. The Ohio occupied a much greater width of the stream than did the Drew. She towed her boats in tiers of four boats in width, and other like boats often carry their entire tow of boats alongside of the steamer, occupying much more space than did the Ohio on the present occasion. So far as was necessary, and connecting it with the qualification that the interests of the general public are not to be impaired unreasonably, the owners of the Ohio properly exercised their own judgment as to the size, arrangement and management of their enterprise. The Drew, on the other hand, requiring little room upon the surface of the river, found speed in passage indispensable to the success of its business, necessarily causing more swell and agitation than is made by the slower passage of a tow-boat. There is no law which limits the space a boat may occupy, or which prescribes how fast it may go, or how much swell it may cause, or how near it may pass to another boat. The rule of permission or of restriction depends in each case upon the reasonableness of the thing done. A dull sailing tow may not occupy unreasonably the entire channel of the river, and thus impede its navigation by all other vessels. A leviathan may not rush through the water with a speed that will overwhelm in its surges all the craft ordinarily to be found upon the river. Nor is a large vessel, under all circumstances, absolutely liable for an injury caused by its swells to an inferior vessel. The waters are open to the use of all kinds of crafts, large as well as small, and, while the rights of the smaller are to be carefully guarded, they are not to be made a pretence for excluding, or preventing the practical use of, larger or different vessels. Sea going steamers move at a rapid rate of speed. They are large and bulky. They necessarily create much motion in the water. Vessels used in the bays and harbors, and in the rivers near New York, for the carriage of passengers,

are built for speed, and without speed their trade would soon come to an end. Their speed also creates much motion in the waters. Is there any rule of law which prescribes that these vessels shall absolutely be liable for injuries occasioned to smaller craft by a swell or motion caused by their passage through the water? Is there any greater or more stringent test of liability than that a large vessel shall use its large powers with care and diligence, and in the mode recognized by those accustomed to the business in which it is engaged as being prudent and proper?

To apply these suggestions to the present case. The Ohio and its tow were lawfully sailing down the Hudson river, at a speed of three miles an hour. The bulk or quantity to be transported, and not speed, is the consideration of her owners. The Drew comes on her passage in the same direction, at the rate of eighteen miles per hour. Speed is the consideration of her owners. If she cannot have this, her business is as effectually destroyed as if the river should be bridged or dammed. The rule of law would seem to be that she is entitled to pass the Ohio. She must, however, have the means and possess the skill to pass her, with knowledge of the waters and with care and prudence. Whatever the usage and practice of those engaged in such navigation adjudge to be necessary precautions, she must take. So, the Ohio and her owners must know that vessels like the Drew are engaged in rapid navigation, and that she must be passed by such vessels, as they overtake her. The towing vessels and the vessels towed must be so constructed and so managed as to meet the contingency of being passed by other vessels. If an overtaking and passing vessel, in prudent navigation, creates swell and suction, arrangements must be made that the boats in a tow shall not be injured thereby. If the swell and suction created by the passing vessel are those to be expected in the ordinary navigation of a rapid vessel, which is managed with prudence and equipped and constructed in a suitable manner, and if the passing vessel has no reason to apprehend that she will do an injury, and a tow is injured thereby, the passing vessel is not responsible. She has but exercised her lawful rights, and the loss must be borne by the injured party. The rule is essentially the same as if a collision had occurred. The vessel is to continue its course as before. The other vessel is to see to it that no collision occurs. But this is not an absolute rule of law. If the passing vessel shall appear to have performed all of its duty, in everything required by care, prudence, knowledge and management, and shall appear to have been thoroughly manned and equipped, but, by some occurrence beyond its control or impossible to foresee, a collision had occurred, the passing vessel is not responsible. So, a superior vessel is bound to great care and diligence, but is not an absolute insurer against injury to an inferior.

That the Drew was right in taking the eastern channel is established by the libellant's own witnesses. The captain and the pilot of the Ohio both testify that the eastern channel is the one usually taken, that it is the main channel, and that passage through the western channel is unusual. The same witnesses on the part of the libellant establish the fact that it was not the practice for passing boats to slacken their speed in deep water like that in this channel, nor at any point south of the city of Hudson. The weight of the evidence is, that the Drew passed as near the eastern shore as it was safe for her to go, and that there was, at least, as much space between the Drew and the tow as between the Drew and the shore. The position of the tow in the middle of the channel, with a slight westerly heading, indicated that a passage to the east of her would be safer than one on her westerly side. I do not, therefore, discover any fault in the Drew for taking the easterly channel or the easterly side of that channel.

The pilots and managers of the Ohio all saw the Drew approaching, and recognized her rate of speed. If they had supposed she was going too rapidly for their safety, a signal to slow up should have been given at once, and, we may suppose, would have been obeyed. Its absence furnishes strong ground to believe that the managers of the Ohio supposed, as did the managers of the Drew, that no change of speed was necessary.

A swell was no doubt created by the Drew, and this threw together the boats in the tow, as it struck them. The hawser line was some four hundred and fifty feet in length, while the length of lines between the different tiers was but six or eight feet. There was nothing to stay the Shoo Fly as she was washed against the Marion, or the Marion as she was washed against the Price. With boats prevented from being more than six or eight feet apart, and nothing to prevent their coming together, it would seem to be almost a necessary consequence that any swell or motion from the rear would precipitate them against each other. If the lines between these tiers had extended fifty or one hundred feet, there is nothing to show that there would have been any difficulty in the present case. I cannot but think that the accident was largely attributable to the different tiers of boats being tied so close to each other. It is quite likely that this compact arrangement enables the steamer the better to manage the tow in its forward motion, but it is defective in protecting it against a power moving from the rear. If struck by a stern wind or tide or swell, and the steamer slackens her hawser, the tow is exposed to this difficulty.

I am not justified in holding, upon the testimony of all the witnesses, that the swell made by the Drew was unusually large, or

that it was dangerous in any other manner than as danger is necessarily incident to the swell from a passing vessel. The pilot of the Ohio says: "I don't think the swells from the Drew were unusual for a boat that came as close as that to us; the swell was not an unusual one for coming so close; the closer they come the more swell they throw on the boats." The captain gives the same evidence. One pilot and some of the captains of the canal-boats thought the swell was large. The result of the whole evidence seems to be, that the Drew, as she passed, created a swell, but that there was nothing unusual about it, or anything to excite the attention of those who managed her. The water was deep, the weather calm and pleasant, with a light wind and a light flood tide.

I have not been able to discover any fault in the equipment or the management of the Drew. She exercised her acknowledged rights in a careful, prudent, and in the accustomed manner. The injury to the boats arose either from the faulty manner in which the tow was made up, or the breaking of insufficient lines, or from the effect of a swell such as was ordinarily made by a boat like the Drew, and such as the Ohio knew she was accustomed to make. Against her speed or her swell the Ohio made no remonstrance. The officers of the Drew testify that they saw no reason to apprehend danger in passing as they did. The officers of the Ohio state, that, at the time, they apprehended no danger.

In his brief, the libellant's counsel insists, "that the swell and suction were caused by the claimants' boat. They were bound, at all events, to prevent it." This is stronger language than the authorities justify. The principle is much the same as that involved in Philadelphia, W. & B. R. Co. v. Stinger, 78 Pa. St. 219, where it was held as follows: "1. A railroad company, having a chartered right to propel their cars by steam, are not responsible for injuries resulting from the proper use of such agency. 2. Whether alarming a horse and causing an accident by a rapidly moving train, or sounding a whistle, will make the company liable for damages, depends upon whether it was from want of proper care in those in charge of the train. 3. What would be due care in running a train through a sparsely settled rural district might be negligence in approaching a large city. 4. A train was passing through a city on a railroad which had a number of short curves, so that persons could see the train but for a short distance; it was crossed by several streets and passed over a river on a drawbridge; the rule of the company required that the whistle should be sounded about a certain point, to warn the bridge-tender and persons about to cross at other streets: Held, the use of the whistle at that point in the ordinary manner was not negligence. 5. If the whistle had not been sounded at such point, and one had been in-

jured by reason of the omission, it would have been negligence per se. 6. One driving an unbroken or vicious horse, or one easily frightened by a locomotive, along a public road running side by side with a railroad, does so at his own peril; the right of the company to move their trains on their road is as high as that of the individual to use the public road." See, also, Favor v. Boston & L. R. Co., 114 Mass. 350.

Some cases in the English courts are supposed to bear upon the question. In the case of The Batavier, 1 Spinks, 378, tried before Dr. Lushington and the Trinity masters, the barge Ann, loaded with forty-nine tons of coal, was sunk in the Thames, on the afternoon of October 5th, 1853. The case states that the barge was sunk by the swell made by the steamer Batavier, both vessels being on their passage up the Thames. The Batavier passed the barge within one hundred and fifty feet, at the speed of nine or ten miles an hour. Her speed caused a swell which flowed over the barge and sank her. A speed exceeding six miles per hour was, by statute, prohibited at the place in question. The court held and found: 1. That the barge had no fault or defect. 2. That the Batavier was in fault in not having seen the swell she made, and in not stopping in time to avoid the accident; that, if she had kept a proper lookout, she would have seen it; and that neither the swell nor the barge were in fact seen from the steamer. 3. That the owners of the Batavier were responsible. This case affords no light by which to decide a case where the vessel libelled was well equipped, kept a good lookout, took the ordinary channel, passed the other vessel at an accustomed rate of speed, and created no unusual or dangerous swell. The case of The Batavier was affirmed by the privy council. 9 Moore, P. C. 286. The points were ruled as in the court below: 1. That no blame or negligence was attributable to the barge. 2. That the steamer was in fault in her speed, and, "if going at such a rate as made it dangerous to any craft which she ought to have seen, and might have seen, she had no right to go at that rate; at all events she was bound to stop if it was necessary to do so, in order to prevent damage being done by the swell to the craft that were in the river." "She ought not to have made that swell in the river if she was aware that there was any vessel which might be damaged and put in jeopardy by her doing so." 3. That an insufficient lookout was kept by the steamer. The principles sustained are those put forth by Dr. Lushington in the case as reported in Spinks.

The case of Luxford v. Large, 5 Car. & P. 421, was at nisi prius before Lord Denman. He charged the jury, that if the swell was occasioned by the improper speed of the defendant's vessel, and if the injury arose from the swell caused by such speed, the defendant was liable.

In Smith v. Dobson, 3 Man. & G. 59, the judgment was based upon the evidence that the defendant's barge was improperly and negligently navigated. The questions debated were chiefly upon the form of the verdict.

I see nothing in these cases in hostility to the principles hereinbefore announced. They do not countenance the idea that the superior vessel is necessarily and absolutely liable to the inferior, in the event of an injury from the swell of the former. They place the decision, in every instance, upon the question of negligence or improper management in the larger vessel. The principles of this opinion are in entire harmony with those laid down in The Alleghany, 9 Wall. [76 U. S.] 522, and in The Syracuse, Id. 672. The cases of The Leo [Case No. 8,250], and The C. H. Northam [Id. 2,689], I have carefully considered.

The decree of the district court must be reversed, and a decree entered dismissing the libel.