## THE SOUTHFIELD.[1]

*(District Court, E. D. New York. January 29, 1884.)*

**DAMAGE TO CANAL-BOAT BY SUCTION AND SURGE CAUSED BY PASSING FERRY-BOAT—EVIDENCE.**

> In an action against the ferry-boat S., to recover damages for injuries caused by the suction and surge produced by the passing ferry-boat to a canal-boat moored in a proper place at a bulk-head at Staten island, *held*, that, upon the evidence, the injuries were caused by the ferry-boat's passing at an unnecessary rate of speed, and that the ferry-boat was liable for the damage sustained.

In Admiralty.

*E. G. Davis*, for libelant.

*Macfarland, Reynolds & Lowrey*, for claimants.

BENEDICT, J. This action is brought by the owners of the canal-boat Annie C. Haeger, to recover for injuries caused to that boat by

[1] Reported by R. D. & Wyllys Benedict, of the New York bar.

the suction and surge made by the ferry-boat Southfield, in passing the canal-boat on the morning of the eighth of May, 1882. The canal-boat was moored at the bulk-head, between Stapleton and the Wrecker's pier, on Staten island, and was there discharging a cargo of malt. She lay with her bow to the northward, with her stern some 25 feet from the line of the north side of the Wrecker's pier, and was made fast to the bulk-head by a four-inch bow-line, a four-inch stern-line, and a three-inch breast-line, all sound and strong. The Southfield was engaged in making regular trips upon the Staten island ferry, and on the trip in question went, according to the answer, from New York direct to Clifton, but according to her proof, from New York to Tompkinsville and then to Clifton, without stopping at Stapleton. As she passed the place where the libelant's boat was moored she created a suction and surge of the water which broke the stern-line and the breast-line of the canal-boat, carried the boat herself out some 25 feet from the bulk-head, and then cast her back with such violence as to throw down persons upon her deck, and do considerable injury to the boat. The place where the canal-boat was moored is a place in common use for discharging of boats, where boats like the libelant's can lie without injury, provided the ferry-boats use moderate speed when passing at low tide. Upon the evidence it is impossible to attribute the injury of the canal-boat to any neglect on her part, either in selecting an improper place to discharge or in omitting reasonable caution in respect to her mooring. It is also beyond dispute that the immediate cause of the injury was the suction and surge created by the Southfield as she passed down to Clifton on the 6 o'clock morning trip from New York, the tide being then low. The inquiry, therefore, is whether this suction and surge is attributable to any neglect of duty on the part of the Southfield. The law applicable in cases of this description is not in doubt. It is thus stated in the case of *The Morrisania*, 13 Blatchf. 512:

"The undoubted right of the steam-boat to the navigation of the river is subject to the restriction that it must be exercised in a reasonable and careful manner, and do no injury to others that care and prudence may avoid."

By the law, it was the duty of the Southfield, in passing the libelant's boat, to avoid endangering that boat by her suction, provided that could be done by the exercise of reasonable care in respect to speed. The ferry-boat had the right to pass from Tompkinsville to Clifton at low as well as at high water, and she had the right to select such a course, and to move with such speed, between these points, as would enable her to make the landing at Clifton in safety. But in view of the situation of the canal-boat, she owed a duty to the libelant to pass the canal-boat at as low a rate of speed as was consistent with her safe navigation to the Clifton landing. This obligation is acknowledged in the answer, when it is averred that the ferry-boat passed without causing or creating any unnecessary or unusual disturbance in, or suction of, the water about the said bulk-head, and

employing only such speed as was actually necessary to enable her to make her said docks in safety. The answer also indicates, with sufficient accuracy, what speed was actually necessary to the safe navigation of the ferry-boat at this time and place, for it avers that the engine of the ferry-boat was slowed abreast of the Stapleton pier, and with the aid of wind and tide the ferry-boat floated past under moderate steerage way and careful handling.

The decision of the case turns, then, upon a question of fact, namely, whether the ferry-boat passed the libelant's boat as described in the answer, or at unnecessary speed, as charged in the libel. Upon this question the weight of the evidence is with the libelant. The libelant, who was on the deck of his boat, and watching the ferry-boat, testifies that the ferry-boat did not check her speed until after she passed the Wrecker's pier. He also testifies that his attention was called to the ferry-boat by his deck-hand. That he said to the deck-hand, "Is she going to check down?" and the deck-hand replied, "I guess not, by the looks." This conversation had at the time, with the ferry-boat in view and under attention, strongly confirms the master's statement that the ferry-boat did not check her speed until after she had passed his boat.

In opposition to this statement of the libelant, the claimants produce the testimony of the pilot and wheelsman of the ferry-boat. The testimony of the pilot, which, it will be observed, is not strictly in accordance with the statement of the answer, is this: "When we left Quarantine dock we hooked the boat up, and when I got within 200 feet of the Club House dock, I shut her off with one bell, and from there to Clifton I ran shut off." Elsewhere he says that he rang the one bell because he could not manage the boat at full speed. But he makes no claim to have navigated the ferry-boat with any reference to the effect of her navigation upon the boats lying at the bulkhead, nor did he know of the damage done until his return from New York on the next trip, and his testimony, taken together, is calculated to raise a doubt as to his having any distinct recollection of the place where he slowed his boat on this particular trip. Certainly, it is not sufficient to outweigh the testimony of the libelant, whose attention was called to the speed of the ferry-boot by the danger of his boat, and whose statement is confirmed by the conversation had at the time. No support to the pilot's testimony is derived from the testimony of the wheelsman, who manifestly has little, if any, recollection respecting this particular trip. Moreover, the libelant's testimony in regard to the speed of the ferry-boat is in harmony with the result, while that of the ferry-boat pilot is not. That the passing of the ferry-boat was followed by an unusual suction is proved, and not denied. It is also shown by the movements of the canal-boat. This unusual suction is accounted for by unnecessary speed on the part of the ferry-boat, and the evidence discloses nothing else to which it can be attributed. Probability seems, also, on the side of the libelant's state-

ment that the ferry-boat passed him without checking. The ferry-boat omitted the Stapleton landing, and this indicates that the boat was short of time, as, according to the superintendent, she some times was on the morning trip from New York. Being short of time, it is by no means improbable that she ran longer than usual before checking her speed. My conclusion, therefore, is that the damage sued for was caused by a neglect of duty on the part of the ferry-boat in this, that she passed the libelant's boat at an unnecessary rate of speed.

A decree must be entered in favor of the libelant, with an order of reference to ascertain the amount.