### THE NEW YORK.

(District Court, N. D. New York. June 10, 1901.)

1. SHIPPING—DUTY OF CARE IN NAVIGATION.

In the navigation of the Hudson river, which is open to all craft, it is as much the duty of boats which from their size, shape, or unseaworthy condition are unable to safely withstand the ordinary perils of such navigation, such as the swell caused by large steamers, to avoid placing themselves in exposed positions, as it is of such steamers to exercise care as to their rate of speed.

2. SAME—NEGLIGENT NAVIGATION—EVIDENCE CONSIDERED.

Evidence *held* insufficient to sustain the allegation of a libel that the loss of a canal boat, which was crushed between a dock and other craft moored outside of her, by the force of the swell caused by a passing steamer, was due to the negligent speed of the latter, but to show that the steamer was properly navigated, and the fault was that of the canal boat, which was old and unseaworthy, and heavily loaded, and was removed from a place of safety, and placed in a dangerous position, next the dock, close to a narrow channel in the Hudson river, with two other loaded boats outside, at a time when it was known that the steamer would soon pass.

3. SAME—LIBEL FOR SINKING BOAT AT DOCK—LACHES.

The conduct of the owner of a canal boat sunk at a dock by the swell from a passing steamer, in taking no measures to raise her, and in making no claim against the steamer for two years thereafter, is a matter which may be properly considered as casting suspicion on the merit of the claim that the loss was due to the steamer's negligence.

In Admiralty. Libel by owner of canal boat Thomas Carroll alleging negligence in the navigation of the Albany Day Line steamer New York, by which the Carroll was sunk at the Horton dock, a short distance south of New Baltimore, on the west side of the Hudson river.

John W. Ingram, for libelant.
W. M. K. Olcott, for claimant.

COXE, District Judge. The rules which the courts have repeatedly laid down for the guidance of large steamers in crowded harbors are hardly applicable to river navigation where the danger

from collision, swells and suction is greatly reduced. The navigation of the Hudson river is open to all craft and each must exercise due care and caution, having regard to the ordinary conditions which are, or should be, familiar to all river pilots and mariners. A steamer has no right to proceed at a rate of speed dangerous to craft rightfully in the river or properly moored along its banks, but, on the other hand, boats which, from their size, shape or unseaworthy condition, are unable to meet the ordinary dangers of navigation should not deliberately place themselves in exposed positions. The wisdom of this rule was recognized in all the ancient codes and is thus quaintly expressed: "The reason is, that some masters who have old crazy ships, may willingly lie in other ships' way, that they may be damnified or sunk, and so have more than they were worth for them." Laws Wisbuy, art. 26; Laws Oleron, art. 14.

It is as much the duty of a canal boat as of a steam vessel to avoid danger. The obligations are reciprocal. If, therefore, an old and unseaworthy canal boat deliberately and knowingly places herself in a steamer's way, the latter not knowing of her infirmities and proceeding with the caution required by prudent navigation at the given locality, it is manifest that the canal boat alone is responsible for any disaster which may overtake her. The law governing these relations is clearly stated in the following authorities: The Daniel Drew, 13 Blatchf. 523, Fed. Cas. No. 3,565; The Drew (D. C.) 22 Fed. 852; The Batavier, 9 Moore, P. C. 286; The Massachusetts, 10 Ben. 177, Fed. Cas. No. 9,258; The Southfield (D. C.) 19 Fed. 841.

The single charge of negligence against the New York is that she approached and passed the Carroll "at an excessive rate of speed, to wit, about twenty miles an hour, and causing such a swell and commotion in the river that the said canal boat Thomas Carroll was thereby crushed and torn to pieces between said dock and said adjacent boat and sank and became a total loss." The burden is upon the libelant to prove the negligence as charged, and the court is of the opinion that he has failed to sustain the burden.

The reasons for this conclusion are as follows:

First. The testimony of several of the witnesses for the libelant is incredible upon its face. Taken as a whole it is exaggerated, contradictory and uncertain. The impossibility of determining with accuracy the speed of an approaching boat is so well known and has been so often commented upon by the courts that it is unnecessary to discuss it in detail. It is enough to say that it was a physical impossibility for the New York to maintain, at the point in question, the high rate of speed testified to by some of the libelant's witnesses.

Second. The witnesses for the claimant testify that, owing to the character of the channel and the low water in the river, the New York was making eight miles an hour until she reached a point about a quarter of a mile south of Horton's dock when, noting the exposed position of the canal boats, her engines were rung down to "dead slow" and she passed at a speed not exceeding six miles an hour, which, the testimony shows, was all that prudent and care-

ful seamanship demanded. A sound boat could not have been injured in such circumstances. It seems to be conceded on all hands that six miles per hour is a prudent rate of speed.

Third. The officers and crew of the New York are, to a certain extent, interested witnesses and the court would be confronted with a more difficult problem were it not for the fact that they are corroborated by a piece of evidence which is almost a demonstration. The pilot report book contains a record of each trip made by the steamer during the season of 1897. In it is noted the exact time when each town on the river is reached. Horton's dock lies between Coxsackie and New Baltimore and on the day in question it took 33 minutes to make the distance between these places. The entry was made at the time and when no one on the New York was aware that any damage had been done to the Carroll. The book shows not only that the New York was going at a slow rate of speed between these places, but also that on every other occasion during the month of August she had made the distance in from 3 to 11 minutes less time. If the libelant's witnesses are correct as to her speed the log would have indicated only about 15 minutes, instead of 33, between the two places. Assuming that the distance between these places is correctly given at 3½ miles, the rate of speed was but a trifle over 6½ miles per hour. But the testimony is undisputed that for some distance above Coxsackie the speed was 8 miles, so that it is plain that during a part of the way it must have been considerably less than 6 miles per hour. Upon no conceivable theory could the New York have been going at a dangerous rate of speed. There is no plausible explanation of the entries except that the claimant's testimony is true that the steamer slowed down as she approached the boats.

Fourth. The Carroll was built in 1878 and was, therefore, nearly 20 years old at the time of the accident. For her own convenience she was towed from an absolutely safe position to Horton's dock near a narrow channel and with full knowledge that the New York would pass up the river at some time during the afternoon. The Carroll was loaded with ice and was placed next the dock with two other loaded canal boats lying abreast outside of her. No steamer could pass up or down the river without producing some swell and suction, the effect of which would necessarily be to force the outside boats against the Carroll and the Carroll against the dock. The position was one of danger for a sound boat, but for an old boat, with soft and rotten bottom timbers and a heavy load of ice, it was one of peculiar hazard.. It is thought that no one can read the testimony showing the unseaworthy character of the Carroll without being convinced that it was a serious fault to place her in a position where she would surely be pounded against the dock by the swells of passing steamers. The court is convinced that the accident is to be attributed to the old and weak condition of the Carroll and not to any fault on the part of the New York.

Fifth. The conduct of the libelant casts discredit upon his case. The Carroll was sunk August 7, 1897. No claim was made until the summer of 1899, two years thereafter. After the accident no effort was made to raise the Carroll and she was allowed to remain

a dangerous derelict until wreckers of the government were sent to destroy her. The presumption is persuasive that the reason she was not raised and repaired was that her owner knew that she was not worth repairing. 'Is not this conduct entirely inconsistent with the theory that he honestly · believed that the New York was responsible for the sinking? As pointed out in the case of The Massachusetts, supra, steamers seldom know, at the time, of injuries occasioned by passing swells and it is the duty of parties damaged to make it known at once. It is obvious that a delay of two years might leave the steamer without any means of refuting such an accusation and wholly at the mercy of the libelant. It is a wise and salutary rule that such conduct as is here shown casts suspicion upon the genuineness of the libelant's claim. It follows that the libel must be dismissed.